Russell S. ENDE, et al., Plaintiffs,

v.

**BOARD OF REGENTS OF NORTHERN ILLINOIS UNIVERSITY, Defendant.**

No. 79 C 20034.

United States District Court,
N.D. Illinois, W.D.

May 10, 1983.

Anthony R. Fabiano, Shaw, Fabiano & Cacciatore, Rockford, Ill., Mark D. McGuire, Robert B. Crosby, Crosby, Guenzel, Davis,

**502**

Kessner & Kuester, Lincoln, Neb., for plaintiffs.

Henry J. Close, Robert G. Coplan, John J. Templin, Thomas Z. Hodson, Connolly, Oliver, Goddard, Coplan & Close, Rockford, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

### ROSZKOWSKI, District Judge.

Before the court is a reverse discrimination claim filed by the plaintiffs, a class of male professors, against the Board of Regents of Northern Illinois University ("NIU"). The plaintiffs allege that a new compensation scheme introduced to remedy salary discriminations against female professors violates the Equal Pay Act. 29 U.S.C. § 206(d). The issue of liability was tried before the court on March 16 and 17, 1982. For the reasons stated herein, the court finds in favor of the defendant and hereby enters judgment on the liability issue in favor of the Board of Regents of Northern Illinois University and against the plaintiff class.

■ The issue before the court is whether the Equal Pay Act prohibits the implementation of an affirmative action salary program which increases compensation to female employees solely because of gender. The court holds that where, as here, female employees have suffered from documented salary discrimination, the Equal Pay Act permits salary adjustments which substantially remedy discriminatory salary practices.

The jurisdiction of the court is invoked pursuant to 28 U.S.C. § 1331. This opinion constitutes the court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

On January 12, 1973, Margaret Joyce Nelson, an employee of Northern Illinois University, filed a complaint with the Regional Office of the Office of Civil Rights of the Department of Health, Education and Welfare (hereinafter "OCR"). The complaint alleged that Northern Illinois University discriminated against female faculty personnel in matters of salary. On December 19, 1974, OCR informed NIU that its investigation revealed that there was "reasonable cause to believe" that NIU had discriminated against females because of their sex.

In late 1974, NIU also conducted its own internal investigation of salaries at the University. The independent investigation confirmed that there was a salary differential between male and female faculty members, and that salaries of female faculty members were significantly lower than those of males.

■ When NIU's own investigation confirmed the reasonable cause determination made by OCR, the University chose to remedy voluntarily[1] the discriminatory salary practices. All parties agree, as a factual matter, that the pre-1975 salary structure did discriminate against female faculty members.

NIU's internal investigation indicated that the aggregate amount of the discrepancy between annual salaries of male and female faculty members was approximately $160,000. The University Council Personnel Committee therefore set out to establish a salary formula which would, in the aggregate, pay NIU's female professors an additional $160,000.

---

1. The parties disagreed over whether NIU's efforts were indeed voluntary. The Acting Provost for NIU testified that he believed that NIU was legally obligated to revamp its salary structure after OCR determined that there was probable cause to believe the existing structure was discriminatory. A probable cause determination is preliminary in nature, however, and does not legally compel a party to take corrective action. NIU acted therefore, at least in part, out of the mistaken belief that corrective measures were legally required. Because the University was not required by law to change its salary structure, the court finds that the actions taken were voluntary.

The voluntary/compulsory distinction, however, is not of great significance to this court. All parties agree that the previous salary structure was discriminatory and that is the primary inquiry—whether there is documented past discrimination.

To finance the increase, NIU established a special fund from which the adjustments to female faculty member's salaries would be made. The fund was separate from those funds available for general faculty salary increases and the regular general faculty increases were distributed in the usual way. The only change would be that after the usual salaries were distributed, the female professors would then receive an additional amount from the special fund.

The Committee responsible for devising an allocation formula considered various proposals. One proposal was suggested by Richard M. Cady, a political science professor at NIU who had been studying the salary structure at the University since late 1973. Professor Cady's proposal included a "marketplace" factor which attempted to adjust for the salary differentials between different academic fields. A business or engineering expertise, for example, is more valuable in the private market than expertise in fields such as education or art. Consequently, a business or engineering department is forced to pay higher salaries to retain talent than is an education department. Professor Cady proposed that the allocation formula reflect this "market factor." Professor Cady's proposal was not adopted, however, and the formula ultimately chosen did not adjust for the market factor.

The formula ultimately chosen by the university was called an "affirmative action equity adjustment formula." As a starting point, the formula identified the mean monthly salary for a male NIU professor. It was also determined the mean time in rank for a male NIU professor was seven years. After determining these mean figures, NIU established a point system to systematically compare women faculty members and librarians with their male counterparts. The formula used to determine the point total for each woman was as follows:

a) One point, plus or minus, for each dollar of difference between their monthly salary and the male mean salary by rank. (The male averages by rank are:

Full Professor $2,388, Associate Professor $1,940, Assistant Professor $1,543, and Instructor $1,248.

b) Five points, plus or minus, for each year of difference between their years in rank and the male mean years in rank.

c) Five points for each year of service to Northern Illinois University.

d) Add a, b, and c to determine total points.

Once total points were determined, the number was multiplied by sixty cents. The sixty cent value was determined by dividing the total accumulated points for all women into the available affirmative action dollars. The resulting figure, rounded off to the nearest five dollar increment, constituted the additional monthly amount the female professor would receive. Two examples illustrate the application of the formula:

1) A female professor at a salary of $2,340 with 19 years in rank and 29 years at Northern Illinois University would accumulate 253 points or $152. The mean salary for male professors is $2,388 and the mean time in rank is seven years.

| | | Points |
|---|---|---|
| a) Salary | $2,388 (male) −2,340 | 48 |
| b) Years in Rank | 19 7 (male) | |
| | 12 x 5 | 60 |
| c) Years at NIU | 29 x 5 | 145 |
| d) Total Points | | 253 |

(253 x .60 = an additional $152 a month)

2) A female professor with a salary as a full Professor of $2,500 and 18 years in rank would have accumulated 53 points or $32.

| | | Points |
|---|---|---|
| a) Salary | $2,388 (male) 2,500 | −112 |
| b) Years in rank | 18 7 (male) | |
| | 11 x 5 | 55 |
| c) Years at NIU | 22 x 5 | 110 |
| d) Total Points | | 53 |

(53 x .60 = an additional $32 a month)

The adjustment was implemented with the first pay period of the 1975–76 academic year. OCR then informed NIU, in a letter

dated October 20, 1975, that because of actions taken and proposed actions, OCR was recommending to its headquarters office in Washington, D.C. that the case be closed.

Donna Brogan, a statistical expert with experience in salary-based sex discrimination cases, credibly testified about the effects of the plan. She stated that the plan had substantially eliminated the salary discrepancy between male and female professors at Northern Illinois University. She did admit on cross-examination, however, that the plan would be a better plan if it had adjusted salaries on a department-by-department basis. She further stated that if she had been asked to design an appropriate plan for Northern, she probably would have included some adjustment to reflect the private market demand for a given department's expertise. She was of the opinion, though, that the overall plan was reasonable and it met substantially its intended purpose.

The formula, once implemented, did, undisputedly, have the effect of raising some female faculty salaries above those of certain similarly situated male professors. Certain male professors complained, noting that female professors with experience similar to certain males received an upward salary adjustment; but similarly situated males received no adjustment.

Between June 5, 1975 and May 12, 1977, a number of male faculty members filed complaints with the Equal Employment Opportunity Commission alleging that the formula adjustment discriminated against them. EEOC transferred the complaints to OCR. Upon investigation of the complaints, OCR concluded in its letter of November 11, 1977 that "there [was] no reasonable cause to believe Northern Illinois University [had] discriminated against complainants [the male faculty members] based upon sex."

On August 21, 1978, the named plaintiffs filed this action claiming they were discriminated against on the basis of sex in violation of the Fair Labor Standards Act, 29 U.S.C. § 206(d)(1). EEOC reasserted its jurisdiction over the complaints of the male faculty members and, in a determination issued March 5, 1979, the EEOC concluded that "there is no reasonable cause to believe that [NIU] engaged in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964, as amended." The case was then returned to this court, discovery was completed, and a bench trial was conducted on March 16, and 17, 1982.

At trial, plaintiffs alleged that NIU voluntarily adopted the "university-wide male average" formula adjustment plan knowing that it would result in a disparate impact upon certain male employees. Plaintiffs' major objection to the plan was that it did not make adjustments on a department by department basis. By adjusting all female salaries according to a university wide average, plaintiffs argue that NIU created an unlawful windfall for female professors in lower paying departments by raising them to a salary approximating the university average; yet left male professors in those same departments at their previous salary levels. Plaintiffs contend that NIU was not required by OCR to adopt this specific "university-wide average" plan and that adoption of the plan constituted wilful discrimination against plaintiffs.

The facts at trial established the plaintiffs' allegation that the plan had a disparate salary impact on male professors. An illustrative example was the case of Inez Bishop (a female) and Russell Ende (a male), both of whom were in the same department. Each had the same academic rank for the same period of time and each had been employed by NIU for nearly the same length of time, with Inez Bishop having nine years of service and Russell Ende ten years. By applying the university-wide salary adjustment formula, Inez Bishop received a monthly raise of $265.00. Russell Ende, because he was a male, received no adjustment. Consequently, after the formula was implemented, Inez Bishop was making $215.00 a month more than Russell Ende.

If the adjustment formula had been applied to Russell Ende, he would have received a monthly increase of $240.00. He

was a full professor in 1975, had 10 years service at NIU (4 in rank), and his monthly salary was $2,025.

| | | Points |
|---|---|---|
| a) Formula salary | $2,388.00 | |
| Ende salary | $2,025.00 | 363 |
| b) Years in rank | 4 (Ende) | |
| | 7 (Male) | |
| | −3 x 5 = | −15 |
| c) Ende years at NIU | 10 x 5 = | 50 |
| d) Total Points | | 398 |

398 points x $.60 = $238.80; rounded to the nearest five dollar increment equals $240.00 per month due to Russell S. Ende starting September 1, 1975.

Mr. Ende, of course, received no increase.

At trial, the University acknowledged the effect on male professors, but defended by asserting that programs designed to rectify conspicuous past discrimination should not be held to violate the Equal Pay Act even though there is a discriminatory salary impact on males.

## CONCLUSIONS OF LAW

The Equal Pay Act essentially requires employers to pay equal wages for equal work. Section 206(d) provides:

"No employer having employees . . . shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ."

29 U.S.C. § 206(d).

The legislative history shows that the Act was primarily intended to eliminate the wage discrimination which existed between men and women performing substantially the same work. Prior to the Act, women often received lower wages than men even though they performed the same work as their male counterparts. In *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), the Supreme Court, after reviewing the Senate Report which accompanied the Act, concluded that:

Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry—the fact that the wage structure of "many segments of American industry has been based on ancient but outmoded belief that a man because of his role in society, should be paid more than a woman even though his duties are the same."

*Id.* at 195, 94 S.Ct. at 2228 (quoting S.Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)). The Third Circuit, in one of the first decisions to construe the Act, reached a similar conclusion, stating that:

The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.

*Shultz v. Wheaton Glass Co.*, 421 F.2d 259 (3rd Cir.1970), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). The Act has, however, been applied to protect men as well as women. *E.g. Board of Regents of the University of Nebraska v. Dawes*, 522 F.2d 380 (8th Cir.1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *Lyon v. Temple University*, 543 F.Supp. 1372 (E.D.Pa.1982).

The parties agree that the NIU salary structure violates the literal terms of Section 206(d). The salary structure unquestionably has the effect of paying female professors in some departments a higher salary than their male counterparts, even though the job requires the same skill, effort, and responsibility for both male and female professors. Due to the salary structure, Russell Ende, a male professor, is paid $215.00 a month less than a female professor, Inez Bishop, even though the two teach in the same department, hold the same academic rank, and have been employed by

NIU for nearly the same length of time. The sole reason Ms. Bishop enjoys a greater level of compensation is that she is female.

NIU's literal violation of Section 206(d) is further supported by case law, particularly the Eighth Circuit's decision in *Board of Regents of the University of Nebraska v. Dawes,* 522 F.2d 380 (1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). In *Dawes,* the University of Nebraska undertook a review of its salary structure and implemented adjustments within the structure to eliminate salary discrimination against female employees. The University's plan formulated a hypothetical average male salary based on education, specialization, experience and merit. The University then considered these same factors with respect to each of the female faculty members. The University discovered that thirty-three of its one-hundred and twenty-five female professors were below the hypothetical average male salary for a person with their qualifications. Accordingly, the salaries of the thirty-three females were raised to the formula level salary.

As the Court noted, the University salary equalization adjustments had two effects: "[i]t established an 'average' male formula salary as the minimum salary for females and it left a number of males receiving less than the formula salary." 522 F.2d at 382–83.

The University brought a declaratory judgment action against the ninety-two male professors who were receiving less than the formula salary. As in the present case, these males were employed in lower paying departments (Agriculture and Home Economics). The male professors, in their answer, contended that the plan violated the equal pay provisions of the Fair Labor Standards Act. The district court entered judgment in favor of the University.

On appeal, the Eighth Circuit reversed the district court and found that there was a violation of the equal pay provisions of the Fair Labor Standards Act. The Court noted that the defendant class had "proved that at least ninety-two male professionals (having substantially equivalent education, experience, and merit) were retained by the two colleges at a wage less than the minimum established for the females." 522 F.2d at 383. This proof "established that the members of the class were unlawfully discriminated against." *Id.*

NIU readily admits that its salary schedule would appear to be unlawful under the dictates of *Dawes.* The defendant hastens to add, however, that since *Dawes* the United States Supreme Court has twice embraced the affirmative action program as an acceptable, lawful, and necessary means of redressing the discrimination suffered by minority groups within this society. *See Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United Steelworkers of America, AFL–CIO v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, *reh. denied* 444 U.S. 889, 100 S.Ct. 193, 62 L.Ed.2d 125 (1979). Where, as here, all parties concede that discrimination did in fact exist, NIU argues an affirmative action salary adjustment is appropriate. Furthermore, defendants stress that courts have been very reluctant to disturb affirmative action programs, fearing that active judicial review will discourage voluntary acts to remedy proven discrimination. *E.g., United States v. City of Alexandria,* 614 F.2d 1358 (5th Cir.1980). Consequently, NIU argues that affirmative action programs, under the present state of the law, are to be upheld if they are reasonable and substantially fulfill their intended purpose. The NIU plan, defendant argues, is reasonable and did substantially remedy the effects of the past salary discrimination.

Any complete analysis of affirmative action programs begins with *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In *Bakke,* a divided Court held that the minority status of a medical school applicant may be considered as a favorable factor by a university committee responsible for admission decisions. In *Bakke,* the defendant medical school had set aside sixteen of the school's 100 positions exclusively for minority applicants. The plaintiff alleged

that this plan violated the Equal Protection Clause and Title VI of the Civil Rights Act of 1964.[2] The Court declared the quota style special admissions plan illegal because it denied so-called majority applicants the chance to compete for 16 seats solely because of their race. The Court, for differing reasons, was able to agree that it was lawful for the school to consider race as one of a number of factors when evaluating admission applications. Justice Powell, in an opinion joined in by Justices Brennan, White and Marshall, reasoned that an admission program which deems "race or ethnic backgrounds ... a 'plus' in a particular applicant's file, yet ... does not insulate the individual from comparison with all other candidates for the available seats" would be an acceptable program. 98 S.Ct. at 2762.

The Supreme Court's moderate endorsement of affirmative action programs in *Bakke* blossomed into a stronger and more unified position in *United Steelworkers of America, AFL–CIO–CLC v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, *reh. denied* 444 U.S. 889, 100 S.Ct. 193, 62 L.Ed.2d 125 (1979). In *Weber,* a white employee sued his employer and union challenging the legality of an affirmative action plan for on-the-job training. The plan, a result of collective bargaining, reserved for black employees fifty percent of the openings in an in-plant training program until the percentage of black craft workers in the plant was commensurate with the percentage of blacks in the local labor force. Weber, the plaintiff, contended that the plan violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Section 703(a) of Title VII prohibits employers from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a). Section 703(d) contains a similar prohibition which applies to labor organization activities. *See* 42 U.S.C. § 2000e–2(d).

██ In upholding the plan, the Supreme Court held that Title VII does not prohibit all race-conscious affirmative action plans. The court conceded that a literal reading of the statute would appear to prohibit a race-conscious plan; but held that the purpose of the statute was to battle "the plight of the Negro in our economy." 443 U.S. at 202, 99 S.Ct. at 2727. Consequently, the Court concluded that "Title VII's prohibition in §§ 703(a), (d) ... does not condemn all private, voluntary, race-conscious affirmative action plans." 443 U.S. at 208–09, 99 S.Ct. at 2729–30.

As in *Bakke,* the Court recognized that the affirmative action program before it, to some degree, compromised the legitimate interests of Kaiser's white employees. In striking a balance between the two competing interests, the Court suggested that a plan which does not "unnecessarily trammel the interests of white employees" is acceptable. 99 S.Ct. at 2730. The Court ruled that the Kaiser plan did not unnecessarily trammel on the rights of others and is "within the area of discretion left by Title VII to the private section voluntarily to adopt affirmative action plans designed to eliminate conspicuous racial imbalance." *Id.*

Post *Bakke* and *Weber* decisions have uniformly interpreted *Bakke* and *Weber* as authorizing affirmative action programs which are "reasonable" efforts to eliminate discrimination against minorities.[3] An illustrative decision is *United States v. City of Alexandria,* 614 F.2d 1358 (5th Cir.1980).

---

**2.** Section 601 of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U.S.C. § 2000d, provides as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

**3.** *See e.g. Setser v. Novack Inv. Co.,* 657 F.2d 962, 968 (8th Cir.1981) (affirmative action plan is valid if it is "reasonably related to the plan's remedial purpose"); *Stotts v. Memphis Fire Dept.,* 679 F.2d 541, 553 (6th Cir.1982) ("The test is whether the [affirmative action] technique is a reasonable response"). For a comprehensive listing of cases applying the reasonableness test, *see Stotts, supra* at 552–54.

In *City of Alexandria,* the Justice Department sued the City for an alleged pattern and practice of discriminatory employment practices in the fire and police departments. The Department's primary allegation was that the City's practices discriminated against blacks and females. Filed along with the complaint was a partial consent decree signed by both parties. The decree spelled out in great detail a plan to insure that blacks and females would not be unlawfully discriminated against in the future. The district court refused to sign the consent decree because it would permit discrimination against whites in the absence of a judicial finding of past discriminatory conduct. The Appellate Court reviewed the decree and found that its provisions were neither unreasonable, illegal, unconstitutional or against public policy. The Court concluded that "the remedial provisions contained in the decree are a reasonable effort to ensure equality of opportunity for blacks and females without unduly sacrificing the interests of white males." 614 F.2d at 1358.

The *City of Alexandria* Court also articulated the prevailing view that active judicial review of affirmative action plans by courts armed with hindsight will only serve to discourage voluntary adoption of plans designed to assist minorities. The Court stated:

> Like the defendants in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the defendants here were on a "high tightrope without a net beneath them." *Weber, supra,* 99 S.Ct. at 2731 (opinion of Justice Blackmun) *quoting Weber,* 563 F.2d 216, 230 (5th Cir.1977) (dissenting opinion of Judge Wisdom). Like the defendants there, the defendants here face liability for past discrimination against blacks, yet cannot attempt to rectify past wrongs without fearing liability to whites. In the face of strong crosswinds from judicial decisions about affirmative actions, defendants here had performed the difficult acrobatic task required of them, and had nearly crossed the tightrope. They had successfully negotiated a plan that would, over time, undo the effects of past hiring decisions that had resulting in overwhelmingly white male work forces, yet would not unnecessarily trammel the interests of white male employees. The Justice Department was satisfied that the plan was fair and realistic. All that was needed was the trial court's approval.

The trial court however, zealously guarding the tower at the end of the tightrope, was not satisfied. It would not let the defendants off, he said, before they joined with the plaintiffs in performing an intricate dance on the tightrope—a dance involving detailed statistics and complicated proof for fifty-four separate defendants. We do not believe the tower guard must protect its territory so zealously. Rather, it must lend a helping hand to those who have already come this far—the court must look at the proposed plan with a sympathetic eye, and extend what aid it can.

> For a successful performance on a tightrope, the rope must be sufficiently taut to support the acrobat, yet must have enough play to afford him some control. An affirmative action plan has similar constraints. The extent of an acceptable plan cannot be measured with mathematical exactitude. The plan must not strangle employees of any race or sex, but with too much play, the leeway for employment decisions based on racial or sexual prejudices becomes too large. Goals and targets, set at reasonable levels, can afford this degree of flexibility.

614 F.2d at 1366. The Eighth Circuit expressed a similar concern in *Setser v. Novack Inv. Co.,* 657 F.2d 962, 969–70, *cert. denied* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981):

> There is no bright line distinction between permissible and impermissible affirmative action plans. A flexible evaluation of the particular method adopted is appropriate. Private employers face loss of substantial federal contracts and liability to minorities, if they refuse to initiate affirmative action as a remedy for past

discrimination, and they face liabilities to whites for any voluntary preferences accorded minorities. In light of their dilemma, and out of respect for management prerogatives, *we are reluctant to discourage experimentation by employers in remedying past discrimination.* An employer's plan is a bona fide one if it is reasonably related to its remedial purpose.

(Citations omitted) (Emphasis supplied). The desire to encourage voluntary action has prompted the appellate courts to counsel that the district "court should not attempt to impose its perspective on the parties. The court should only determine whether the decree is within the range of reasonableness." *Stotts v. Memphis Fire Dept.,* 679 F.2d 541, 554 (6th Cir.1982). To the same effect, *see Weber, supra,* 99 S.Ct. at 2730–31 (J. Blackmun concurring), *citing Weber v. Kaiser Aluminum & Chemical Corp.,* 563 F.2d 216 (5th Cir.1977) (J. Wisdom dissenting), ("employers and unions who have committed 'arguable violations' of Title VII should be free to make reasonable responses without fear of liability to whites.")

 After fully considering the policies which underlie affirmative action programs, the court finds that the NIU plan is reasonable and lawful. The court acknowledges that NIU may not have incorporated the best approach when it failed to include the marketplace factor in the salary plan. The plan is nevertheless an adequate and a reasonable plan, one which met substantially its intended purpose. Under *Bakke, Weber,* and later decisions like *City of Alexandria,* that is all the plan must be.

It is true that the plan clashes with the literal terms of the Equal Pay Act. Against this concern, the court balances two considerations.

First, Congress could never have intended for the Equal Pay Act, an Act designed to help women, to be used as a means to strike an affirmative action program which seeks to raise and has raised the salaries of the female minority. In *Weber,* the Supreme Court refused to follow the literal terms of

Title VII which prohibited race-based discrimination, when the literal interpretation would frustrate the purpose of the Act, namely, to better the lot of the Negro. *Weber* therefore counsels against a literal interpretation of the Equal Pay Act which prohibits gender-based discrimination, when that literal interpretation would frustrate a principal purpose of the Act, to insure that women receive the same wage as men when they do substantially the same work.

Second, if reviewing courts, such as this court, were to routinely substitute their own view of the *best* affirmative action plans under the circumstances, voluntary remedial action would be discouraged. In *City of Alexandria, supra,* the Court warned that reviewing courts should not force private litigants to "walk the tightrope", facing liability for discrimination on one side and liability for reverse discrimination on the other. All the parties in this lawsuit agree that discrimination existed and that this plan substantially eliminated the discrepancy between male and female salaries. So long as this purpose was fulfilled in a reasonable manner, as it was, this court will not discourage future voluntary action by substituting its own view of a better plan.

 While this court is sympathetic with the plight of the plaintiffs here, it is clear that the defendant was making a reasonable, good faith effort to adjust inequities which admittedly had existed for many years. On an overall university level, the plan which was implemented by the University did succeed in removing the salary inequities which had existed between male and female employees. Under such circumstances, the court will not substitute its judgment for that of the defendant. To do so would place the University here, and other employers considering corrective action in the future, in the untenable position of attempting to anticipate what a court, acting with the benefit of hindsight, might consider to be a reasonable plan under a particular set of circumstances. Courts should encourage, not discourage, such good faith attempts to correct such inequities

voluntarily. For a court to substitute its judgment under circumstances such as those which exist here would have a chilling effect on employers who, in the future, may be considering the adoption of a plan to correct inequities based on race, color, religion, sex or national origin.

The court's ruling today arguably conflicts with the only other reported decision addressing this same issue. In *Lyon v. Temple University,* 543 F.Supp. 1372 (E.D. Pa.1982), a group of male professors brought an Equal Pay Act challenge against Temple University's affirmative action program which had the effect of raising the salaries of female professors. In ruling on a motion for summary judgment, the court held that *Bakke* and *Weber* did not alter the *Dawes* holding and consequently the plaintiffs stated a cause of action under the Equal Pay Act.

The *Lyon* Court reasoned that *Weber* was to be viewed narrowly, in light of the Court's own statement in *Weber* that "[we] emphasize at the outset the narrowness of our inquiry." *Id.* at 1375, *citing Weber,* 99 S.Ct. at 2726 (bracketed material added). The Court also noted that the Title VII legislation considered in *Weber* has a "broad purpose . . .—elimination of discrimination with respect to all aspects of hiring, firing, and conditions and terms of employment," whereas the Equal Pay Act has a "more narrow focus." *Id.*

The *Lyon* Court further observed that the Temple affirmative action program placed male professors at an unnecessary and *permanent* salary disadvantage. The Court reasoned that "[t]his permanence distinguished the case from *Weber*" because while "the Kaiser affirmative action plan [in *Weber*] necessarily disadvantaged some employees, it was designed to do so only until the past discrimination was remedied." *Id.* at 1376.

The *Lyon* Court, in our opinion, reads *Weber* too narrowly. *Weber* sets out broad guidelines to be applied generally to affirm-

ative action programs and its holding should not be limited to Title VII. Although the *Weber* Court stated its inquiry was a narrow one, it is undisputed that *Weber* has been turned to for guidance by a great number of courts considering affirmative action programs of all types. *E.g. City of Alexandria, supra; LaRiviere v. Equal Employment Opportunity Commission,* 682 F.2d 1275, 1278–79 (9th Cir.1982) (Applying *Weber* to a government affirmative action program aimed at alleviating sex discrimination); *Edmonson v. United States Steel,* 659 F.2d 582, 584 (5th Cir.1981) (Applying *Weber* to a private affirmative action program aimed at alleviating sex discrimination); *Setser v. Novack Inv. Co.,* 657 F.2d 962, 966 (8th Cir.1981) (Applying *Weber* to a race-conscious affirmative action program aimed at alleviating past-discrimination which had action program aimed at alleviating past-discrimination which had violated 42 U.S.C. § 1981); *Tangren v. Wackenhut Services,* 658 F.2d 705 (9th Cir.1981), *cert. denied* 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 175 (1982). (Applying *Weber* to a private affirmative action program aimed at alleviating sex discrimination action). Consequently, this court believes *Weber* is to be consulted even where an affirmative action falls within the parameters of the Equal Pay Act.

Second, the *Lyon* Court underestimates the chilling effect active judicial review of affirmative action programs will have on voluntary action. It is important to note that *Weber* did not hold that any unnecessary *infringement* on majority rights would render an affirmative action program unlawful; instead the *Weber* Court chose much stronger language, stating that a plan is unlawful only when it "unnecessarily *trammel(s)* " on the rights of the majority. *Weber,* 99 S.Ct. at 2730. The decision to use such a strong term was, we believe, a conscious and wise choice. If those seeking to redress discriminatory practices are forced to defend every feature in a plan no matter how minor[4] an infringement that

---

4. We note that the minor harm which results here, a small degree of salary inequity to males,

is certainly a less serious infringement on majority interests than was the Kaiser plan in

feature might cause, voluntary redress of discrimination would cease. The strict judicial scrutiny and the attendant risk of liability would discourage it.

Finally, the "permanence" argument so heavily relied upon in *Lyon* is somewhat illusory. Few organizational plans or salary structures are truly permanent; realistically they are subject to constant change. To say the salary adjustments in *Lyon* or this case are permanent is premature. NIU could, at any time, adjust their salary structure to account prospectively for the market factor without disturbing the obvious and desirable remedial aspects of the plan.

For these reasons, the court finds in favor of the defendant, the Board of Regents of Northern Illinois University, and against the plaintiff class.

*Weber,* which barred white males from competing for 50% of the available in plant job training positions. Thus, the ruling today is consistent with *Weber's* language, as well as its result.