**Rudolf WINKES, Plaintiff, Appellee,**

v.

**BROWN UNIVERSITY et al.,
Defendants, Appellants.**

No. 83–1649.

United States Court of Appeals,
First Circuit.

Argued Jan. 4, 1984.

Decided Oct. 26, 1984.

Pettine, Senior District Judge, sitting by designation, dissented and filed opinion.

* Of the District of Rhode Island, sitting by desig-

Beverly E. Ledbetter, Providence, R.I., with whom Christopher H. Little and Tillinghast, Collins & Graham, Providence, R.I., were on brief for appellants.

William A. Poore, Providence, R.I., with whom Hodosh, Spinella & Angelone, Providence, R.I., was on brief for appellee.

Lawrence Z. Lorber, Stephen L. Samuels and Breed, Abbott & Morgan, Washington, D.C., on brief for Princeton University, Stanford University, Yale University, Johns Hopkins University and Harvard University, amici curiae.

Before CAMPBELL, Chief Judge, ALDRICH, Circuit Judge, and PETTINE,* Senior District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

This action by a male plaintiff claiming that a raise in salary given a female co-employee was in violation of the Equal Pay Act, 29 U.S.C. § 206(d), presents difficult questions, as the length of time taken by a normally prompt court must indicate. Even the district court's views expressed during trial varied somewhat from its ultimate conclusions. We have decided that these conclusions were mistaken, and that the finding for the plaintiff must be reversed.

In September, 1977, in a Title VII action against Brown University, defendant there, and here, charging a policy of discrimination in failing to hire tenured female professors, a consent decree was entered under which defendant agreed to exercise all reasonable means to remedy the deficiencies. The decree contained a hoped-for improvement schedule, with dates and numbers. *See Lamphere v. Brown University,* 491 F.Supp. 232 (Appendix) (D.R.I.1980). The decree did not authorize paying unequal salaries based upon gender; nor does defendant claim that it did. The present is not, in other words, an affirmative action case.

By what has proved to be an unfortunate coincidence, six months after the entry of

nation.

the decree Catherine Wilkinson-Zerner, an associate professor in the Art Department, who had just recently been awarded tenure, received an offer from Northwestern University (Chicago) to an equivalent position, at a salary of $25,000, a substantial amount, 36%, more than what Brown was to pay her for the coming year. The only other associate professor in the art history division was plaintiff Rudolf Winkes. He and Zerner were both budgeted salaries of approximately $18,000. The Art Department chairman, Professor Champa, following a conference with Zerner in which the terms and conditions of the Northwestern offer, and her reaction thereto, were discussed, informed defendant's provost, Glicksman,[1] of the offer and her qualifications, and recommended that the offer be matched, in order to keep her. Glicksman reported to Brown's president, and a matching salary was agreed to, and accepted. Winkes was given a raise to $19,500, and in all years since, although with a decreasing differential, has received less than Zerner.

In May, 1980, Winkes brought suit under the Equal Pay Act, challenging the pay differential between him and Zerner as based solely on gender. After discovery the court conducted a bench trial at which Brown defended on the ground that the differential was based on merit, on market forces, and a policy of responding to outside offers. The court, finding that Winkes had established a prima facie case under the Equal Pay Act, rejected Brown's proffered defenses, and entered judgment for Winkes.

The Equal Pay Act provides,

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: ..." 29 U.S.C. § 206(d)(1).

Winkes established his prima facie case by demonstrating that he and Zerner were paid different salaries for jobs that were comparable with respect to skill, effort, responsibility, and working conditions. The burden was on Brown, therefore, to prove the applicability of any one of the four exceptions in the Act. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).

Defendant could not succeed as to the first three. There was no seniority system; no merit system in the strict sense of the word, and no quantity or quality system in that same sense. The sole question, accordingly, was whether it met the general one, a differential based on any other factor other than sex. For this defendant offered evidence of a de facto policy of responding to outside offers from other universities when it desired to keep the professor and his or her qualities merited such action. We find that it succeeded, for reasons we will come to.

The thrust of the district court's opinion was that Professor Zerner's raise was a precipitate and seemingly unconsidered, unusual, and unmerited, response due to gender, induced by the *Lamphere* decree. It said,

"Without any formal bargaining sessions or negotiations Professor Zerner's salary for 1978–79 was increased to $25,-000;" "a sixty-four percent (64%) salary increase which created the salary differ-

---

1. Glicksman was also named as a defendant, but we use the term defendant herein as referring to Brown.

ential which is the subject of this lawsuit."

. . . . .

Defendant Glicksman stated that he did not even know if the employment offer was gratuitous or solicited by Professor Zerner. Further, the Provost was not aware of the salary structure at Northwestern. The offer was met after only a slight delay, with little research conducted and no negotiations undertaken."

After stating that "[t]he plausibility of Defendants' position is undercut by the existence of the *Lamphere* Consent Decree," the court returned to Zerner's "meteoric rise in earning capacity," and "the unusual speed in responding to the offer, the exceptional dollar for dollar match [and] the invasion of the University's contingency fund."

Passing, for the moment, the matter of the *Lamphere* decree, the full record greatly reduces the strength, and hence significance, of these observations. In the first place, as a result of previous action promoting Zerner to tenure, she was already due a tenure raise, as well as an annual raise. The raise attributable to the Northwestern offer was 36%, not the 64% increase twice mentioned by the court as "creat[ing] the salary differential" without once mentioning the lesser figure. With respect to his ignorance of what had sparked the offer, Glicksman stated it was irrelevant. The court did say why it thought otherwise. To us, the weight of an offer is its content.[2]

The statement that Glicksman was ignorant of Northwestern's salary schedule is to be measured against Champa's testimony that he told Glicksman that "[t]he Northwestern program in the area that she worked in was quite strong, the library was strong, the research report (sic) was strong." Even more is it to be read against Glicksman's testimony that he "had

evidence of salaries including those of Northwestern average (sic) for all associate professors available in charts that are published." None of this was unreasonable, contradicted, or found unbelievable.

If the rise was "meteoric," so, too, concededly, was the offer "high." Whether only two weeks consideration was unusual, and negotiations absent or minimal compared with other cases, requires a more detailed examination of the evidence. We start with Champa's testimony that he did discuss with Zerner the various aspects of the Northwestern position and found them comparable in all respects, except salary; that she seemed entirely willing to move, and that he formed the conclusion that the offer would basically have to be met to keep her. In other words, there was believed to be nothing to negotiate. Nor was it the fact that meeting an offer was exceptional, and that all other cases resulted in trading down. It is true that in other instances of outside offers there was shown to have been a deeper examination and discussion. However, this was because it had appeared that there were inequalities, rendering further examination essential. In the case of Champa himself an outside offer was ultimately met. The court found that when "analyzed ... Brown substantially met ... Dr. Champa's financial and benefit demands." The fact that this meeting was not "dollar for dollar" was due to the fact that the initial dollar figure, on analysis, was not comparable. In this circumstance to say there was no other dollar for dollar match is meaningless.

While in the case of Professor Fishman the offer was not met (although Glicksman testified it was more than met nine months afterwards), the court's suggestion that in considering outside offers the university could not appraise the (there lower) quality of the offering institution is, with due re-

---

**2.** If the court's thought was that Zerner sought the offer as a ploy, with no intention of leaving, Champa testified, post, without contradiction, that she appeared entirely prepared to move.

For the court to find otherwise would be pure speculation. And, in any event, this would have no bearing on the figure that Northwestern thought she was worth.

spect to the court, contrary to common experience.[3]

Finally, the significance of the fact that Zerner's raise exceeded the budget, and hence had to come from the contingency fund, escapes us.

Completing the circle, the testimony of both Champa and Glicksman was to the effect that merit raises were customarily, and almost exclusively, triggered by outside offers. Champa testified that an outside offer "is about the only way, in my experience, that substantial merit increases were ever allocated to [the] faculty ...." There was no contradiction of this, although plaintiff had been at Brown over ten years. It was no contradiction that sometimes the offer was not met. Thus it must stand that it was not unusual, but a customary de facto practice, to award a merit raise on the occasion of an outside offer.

While every case must differ on its facts, on analysis of the record as a whole we must find, contrary to the court's conclusions, that this merit increase was processed fundamentally by the same methods utilized in previous cases.

There was, moreover, no evidence that Zerner's raise, although high, exceeded her accomplishments, present and anticipated. The court, obviously recognizing this, stated as follows.

"The record reveals that Professor Zerner possessed a strong academic record, and impressive professional credentials. This court in no way seeks to diminish Professor Zerner's capabilities as a teacher or belittle her scholarly accomplishments."

Then, however, came the blow.

"Nevertheless, the *Lamphere* decree created a powerful incentive to retain a tenured female professor and caused gender to be the predominate factor in responding to the outside offer."

Further,

"Defendant Glicksman acknowledged that Brown had a commitment to increase the number of tenured women faculty members, and conceded that he was concerned about meeting required goals.... [But] gender, allegedly was not a factor despite the absence of a tenured woman within the Art Department. The timing of the entry of the Consent Decree, followed by Professor Zerner's meteoric rise in earning capacity diminishes the force of Defendant Glicksman's testimony. All the circumstantial evidence, along with the resulting logical and reasonable inferences, point to gender as the factor motivating Professor Zerner's salary increase."

Passing the matter of the "circumstantial evidence," defendant is presented with the blade of a two-edged sword. One blade is the Equal Pay Act. The other is a court order to take all reasonable steps to increase the tenured female faculty. It faces the loss of a concededly valuable woman. Had it not done what it believed necessary to keep her, viz., meet the offer, and had lost her, on the basis of the court's reasoning could it be thought that the question why would not have arisen in the *Lamphere* case? Right on top of the decree, see ("timing") post, it lets a woman go. In defending, defendant would have had to face the fact that receipt of an outside offer was the classic time for giving a merit raise; that it had met an offer in the Art Department before, and that Professor Zerner had unquestioned high merit. On such a record, if defendant had not met the offer, by the present approach might a court not have equally said that defendant used the Equal Pay Act as an excuse for adhering to the practice that *Lamphere* had condemned?

---

**3.** During trial the court expressed surprise that an employer could not weigh the fact that an offer came from the "Bozo Corporation" down the street. And, surely, although there may not be a unanimity of opinion, there are recognized orders of standing of educational institutions, not to be rejected because based upon "nebulous criteria." We see no basis for the court's discrediting defendant's placing itself ahead of Wayne State.

One may ask what is the university to do. To use a decree requiring it to give affirmative recognition to women's merits as the very basis for finding conduct unlawful when it does so would be ironic. But more to the point, how fair is it to assume defendant deliberately created a prima facie case against itself under the Equal Pay Act in order to escape possible criticism in *Lamphere*? Defendant met the Equal Pay matter head on; it did not even claim a justification of affirmative action. Nevertheless, it was penalized in the court's thinking even by virtue of the "timing;" the fact that the decree was so recent. Seemingly, it would have been more excusable to have given Zerner a raise the next year. Yet, obviously, defendant must face an offer when it is presented.

Obviously any university that is a pluralistic entity has a concern with respect to gender, as well as any ethnic or other class underrepresentation, as Glicksman freely admitted. To use that commendable motive in itself, or a decree to that effect, as a predominant ground for finding action that furthers it improper would not only be an unfortunate turnaround of the Congressional intent, but a decided impediment to its achievement. *Cf. NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 670 (1st Cir.1979) ("Trap" to use employer's protected anti-union speech to infer improper anti-union animus). Nor did the court give any reason for concluding that defendant preferred to face a prima facie case of violating the Equal Pay Act than to meet a charge of violating the *Lamphere* decree. We think there should not have been an either-or choice, but that the test should have been one of reasonableness, without a sword, single or double-bladed, to mix our metaphors, placed over defendant's head.

We recognize, of course, that the district court's findings are to be reversed only for clear error. F.R.Civ.P. 52(a). Under this standard, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Fortin v. Commissioner of Department of Public Welfare*, 692 F.2d 790, 794 (1st Cir.1982). We have already pointed out, however, a number of substantial errors. With this in mind, we return to the matter of the Northwestern offer.

Glicksman testified, and Champa agreed, that Champa spoke highly of Zerner and recommended that the offer be met; that he, Glicksman, "had available to me in my files detailed review of her performance and qualifications since her tenure review had occurred that very academic year, and those files were reviewed by me again at that time. He told me of the quality of her performance and the reasons she was a desirable faculty member in terms of her award of a prize by the College Art Association for an article she had published in the Art Bulletin which was considered the best article published by a young scholar that year. He told me the Art Bulletin was the prestigious journal in her field. Also that her being offered that year fellowship at the Institute for Advanced Study [at Princeton] was evidence of very strong qualifications; that she had and was continuing to receive invitations to give lectures at institutions and meetings that were prestigeous, both domestic and foreign ...."

Glicksman further testified that he discussed the matter with the President, and told him the salary was high, but that he, too, thought it was justified.

As to the offer itself, a peer appraisal, backed by a money commitment, would seem highly probative evidence. Glicksman testified that the offer was a "confirmation of the high qualities of her performance, particularly her performance as a scholar, since those are the levels of performance which are most able to be judged by an outside group." We remark, in passing, that in denigrating it because it was received from a "single" university, the

court did not address the fact that plaintiff had not received any offers at all.

It is true that Champa testified he thought plaintiff and Zerner were of equal merit. Glicksman testified he thought she was superior. The court, wisely, did not resolve this conflict. We say wisely because in such a complex area something much more than conclusions would be needed for judicial resolution of, indeed, a perhaps unresolvable matter of opinion.[4]

The court's making the linchpin of its thinking defendant's natural interest in gender poses a real danger of improper interference with intangible, but important rights. "Academic freedom, although not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of the University of California v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978). It should be interfered with only for well-demonstrated, substantive, reasons. *See Cuesnongle v. Ramos*, 713 F.2d 881, 884 (1st Cir.1983). Unfortunately defendant, by a knee-jerk, over-opposition to pretrial discovery, painted itself into a corner, limiting itself to actions in one department, but such a question must be faculty-wide.[5] The amicii institutions view it as of national importance, and we agree.

A university is, of course, not free of the Equal Pay Act, but when it is confronted with possibly opposing pressures or obligations, some of which involve the difficult subject of gender, it must be allowed substantial room to maneuver, rather than find itself between the devil and the deep blue sea.[6] Otherwise, instead of some measure of academic freedom, it will face the constant prospect of judicial reproof. Viewing the record here as a whole, particularly once the deficiencies in the court's other findings are fully regarded, we must hold that defendant was within a permissible area of choice, and made a reasonable decision.

Reversed; the complaint to be dismissed.

PETTINE, Senior District Judge, dissenting.

As the majority states in its opinion, this case has presented difficult questions. The majority has found that the district court's findings of fact were clearly erroneous and that affirmative action was not somehow involved in this case. I disagree. Rather than reverse the district court, I would remand the case for a new trial.

As the majority states, after Winkes put in his prima facie case, the burden of proof under the Equal Pay Act switched to defendants Brown and Glicksman. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195–97, 94 S.Ct. 2223, 2228–29, 41 L.Ed.2d 1 (1974); *Melanson v. Rantoul*, 536

---

**4.** Glicksman testified that a "[f]aculty member is expected to show excellence in performance, in scholarship, that is to carry out research and scholarly activities related to his or her discipline. Also expected to show excellence in teaching and to provide the teaching needed to maintain the program .... And, thirdly, but usually with less weight than the first two, to provide service both to the department and to the community of scholars...."

**5.** Our dissenting brother's comment upon the absence of evidence comparing Zerner's salary university-wise is somewhat troublesome. Unfortunately, when defendant sought to go into this matter at trial, plaintiff objected that he had been rebuffed when seeking discovery in this area on the ground of irrelevancy, the court ruling that defendant had made its bed, and must lie in it. This case should be an object lesson; counsel·should think ahead before opposing discovery. However, although there was much talk about the percentage of Zerner's raise, basically the criticism was that the plaintiff should get the whole total figure, not that the figure was too high.

**6.** *See, e.g., NLRB v. Radio Engineers*, 364 U.S. 573, 575, 81 S.Ct. 330, 332, 5 L.Ed.2d 302 (1961). The writer, qua admiralty judge, notes that the stated predicament is a classic pun. The devil may be thought a characterization of a pirate who, at sword's point, is forcing some unfortunate victim to walk the plank. Actually, one meaning of "devil" is the finish piece between the staggered butts of the upper deck planking and the ship's waterways or hull; also the caulker's name for its jagged seam. *See* THE OXFORD COMPANION TO SHIPS & THE SEA (1976) p. 244. Hence the phrase is a literal description of the victim's hopeless position. Ibid.

F.Supp. 271, 286 (D.R.I.1982). The district court opinion appears to hold that *any* consideration of sex in response to the Northwestern offer was illegal; for the reasons stated *infra*, I do not agree with this analysis. However, the thrust of the district court opinion's findings of fact is that, in comparison to former responses to offers from outside institutions, the defendants acted unusually and unreasonably when they responded to Professor Zerner's offer—both in terms of the procedure used and the eventual substantive bid.

My brothers believe that these findings are clearly erroneous. Nevertheless, as there was no evidence that any other Brown professor had ever gotten such a high response to an outside offer, whether measured as a percentage of the salary the individual was slated to receive or measured in comparison to the amount of the outside offer, as there was no evidence that Brown had ever responded to an outside offer so easily, as the evidence showed that Brown did not always try very hard to keep the individual, and finally, as it is uncontradicted that these events happened soon after the entry of the *Lamphere* consent decree, I cannot share my brothers' conclusion that these findings were clearly erroneous. I do believe that they are incomplete and tainted with an erroneous perception of whether it is permissible to consider sex at all in these circumstances. A remand is therefore in order. *See Guzman v. Pichirilo*, 369 U.S. 698, 701, 82 S.Ct. 1095, 1097, 8 L.Ed.2d 205 (1962) ("If we were convinced, as was the Court of Appeals, that the trial court's action was colored by a misunderstanding of such legal principles, we would have to remand, as the Court of Appeals should have, for further findings by the trial court on the credibility of the owner's witness.").

I agree with the majority that the sixty-four percent salary-hike figure which the district court used may not be precise in that it included a normal yearly raise and a standard raise for reaching tenured status. However, the district court used this figure to compare to a similar figure—a raise of "close to forty percent" which Professor

Fishman received in response to an outside offer. The close to forty percent given Fishman, like the sixty-four percent given Zerner, included a promotional raise and may have included a standard yearly raise.

Moreover, Professor Fishman's outside offer was not met. Similarly, although Brown did "substantially" meet salary demands from Professor Champa during negotiations after he had received outside offers, there was no evidence that Brown actually met the offers or met what the offers were worth given differences in the positions, rather than merely met lower amounts representing a minimum to keep Champa from leaving.

Perhaps Zerner would have left Brown if the Northwestern offer were not met head-on. Professor Champa certainly did believe this. However, responses to outside offers at Brown varied considerably. Some professors did leave Brown after receiving outside offers which did not trigger sufficient raises.

Finally, although in reality there may have been nothing to negotiate, the speed and lack of negotiations in responding to the Northwestern offer do have some probative value. In an area in which examination and negotiation were the norms, one wonders why Brown did not *try* to offer a lower amount, even if just to test Zerner's inflexibility. Instead, Brown purports to have relied on Champa's impression from a phone call informing him of the offer that Zerner was willing to leave if the offer were not met.

Given what is *not* a clearly erroneous finding that Brown's response to Zerner's outside offer was unusual, *see Guzman, supra* 369 U.S. at 702, 82 S.Ct. at 1097 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)), the district court examined when these actions happened. Faced with an extraordinary response to an outside offer to a female faculty member so soon after the consent decree, it was not clearly erroneous to find that the consent decree caused the re-

sponse. Besides finding little significance in the facts that the response to Zerner's offer was the highest and fastest, my brothers do not appreciate its timing. It is this timing and these actions, combined with the timetables in the decree, which inject affirmative action into this case. Any acts involving affirmative action carry a reasonableness requirement. I believe my brothers have misapplied this factor.

Under the *Lamphere* consent decree, Brown was to try to meet certain goals for numbers of female faculty members. Since the loss of a female faculty member would hurt meeting those goals, Brown was entitled to take sex into consideration in responding to outside offers even though this may violate the specific language of the Equal Pay Act. Giving Brown some latitude is necessary to enable Brown to fulfill its obligations under the decree. However, courts have not allowed employers to exercise unbridled discretion in implementing affirmative action plans because of conflicts with other federal policies. In this case, the implementation of a Title VII consent decree and the dictates of the Equal Pay Act conflict. Therefore, especially because of the strict liability nature of the Equal Pay Act, Brown should be required to show not only that 1) a de facto policy of responding to outside offers existed; and 2) that Zerner's raise was an application of that policy; but also 3) that Brown acted reasonably in its response.

In both *Weber* and *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Supreme Court recognized that there are limits on what constitutes a permissible affirmative action scheme. In *Bakke*, the Court held that some consideration of race in a medical school's admissions criteria was permissible, but that the use of a rigid quota was not. In *Weber*, the Court considered a temporary plan under which a company and union voluntarily agreed to allocate 50% of the positions in a craft training program to black workers with less seniority than whites eligible for the program. The Court stated:

We need not today define in detail the line of demarcation between permissible and impermissible affirmative action plans. It suffices to hold that the challenged Kaiser-USWA affirmative action plan falls on the permissible side of the line. The purposes of the plan mirror those of the statute. Both were designed to break down old patterns of racial segregation and hierarchy. Both were structured to "open employment opportunities for Negroes in occupations which have been traditionally closed to them."

At the same time, the plan does not unnecessarily trammel the interests of the white employees. The plan does not require the discharge of white workers and their replacement with new black hirees. Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white. Moreover, the plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force.

443 U.S. 208–209, 99 S.Ct. 2729–30 (footnote and citation omitted).

Two courts have interpreted this language in cases similar to this one. They reached opposite results. In the first, *Lyon v. Temple University*, 543 F.Supp. 1372 (E.D.Pa.1982), a group of male professors challenged Temple's implementation of a plan under which it gave female professors salary increases to compensate for past inequities. The court found that although some pay readjustment for women was permissible, Temple's plan resulted in "an unnecessary and *permanent* salary disadvantage...." *Id.* at 1376 (emphasis in original). Additionally, the court found the principles of flexibility which undergirded *Weber*'s endorsement of reasonable affirmative action plans under Title VII inapplicable to the stricter Equal Pay Act.

*Id.* at 1375–76. As a result, the court held that the plan violated the Equal Pay Act.

In the other case, *Ende v. Board of Regents,* 565 F.Supp. 501 (N.D.Ill.1983), female faculty members were given additional salary to adjust for past inequities according to a formula which took into account the difference between their salaries and the mean salary of males with the same rank, the amount of time the woman had had that rank, and the amount of time that that woman had been at the university. The *Ende* court found that although this plan violated the literal mandates of the Equal Pay Act, it was permissible. The court stated that "[p]ost *Bakke* and *Weber* decisions have uniformly interpreted *Bakke* and *Weber* as authorizing affirmative action programs which are 'reasonable' efforts to eliminate discrimination against minorities." *Id.* at 507 (footnote omitted). Since it found that the university's plan was reasonable, even though not the most preferable plan, the court ruled that Northern Illinois University had not violated the Equal Pay Act.

I agree with the *Ende* court that the *Lyon* opinion both reads *Weber* too narrowly and underestimates the chilling effect on voluntary action of employing a standard stricter than reasonability to judicial review of affirmative action programs. *Ende, supra,* at 510–11. I therefore also agree with *Ende* and other opinions which set forth a standard of reasonableness for judging whether an affirmative action plan is permissible under *Weber.* *See, e.g., Setser v. Novack Investment Co.,* 657 F.2d 962, 968 (8th Cir.1981). However, given the ad hoc and unique nature of the affirmative action "program" employed here by Brown, and given its great possibilities for abuse, I believe that it is necessary to examine not just the reasonableness of their general method, but also the reasonableness of individual decisions. I think that an examination of the reasonableness of the program only, and not individual results, is warranted only when the program is less subjective than the one here. *See, e.g., Ende, supra,* at 503 (Northern Illinois University employed a precise mathematical formula which utilized only objective variables).

The reasonableness of any additional compensation would be determined by Brown's ability to meet *Lamphere* without paying the individual an anomalously high salary when compared to other salaries at Brown. *Lamphere* does not require that any specific position be filled by any specific individual. Brown may hire another experienced female scholar directly into a tenured position. Therefore, among the relevant inquiries for a court would be: 1) how much it would need to pay to lure another female professor with credentials of the same quality as Zerner's to a tenured position in the Art History Department at Brown; 2) Brown's normal inquiry when responding to an outside offer, which is determining the minimum amount of salary increase necessary to keep that particular individual at Brown; and 3) how much does it want to retain this particular individual because of particular credentials or because of the type of subjective considerations allowed by the first amendment academic freedom setting of this case.

In addition, I do not believe that this approach would place Brown in a "no-win" situation, or one in which a double-edged sword is placed over the university's head. The criteria I propose are based on reasonableness, fairness, and allow full consideration of first amendment concerns. Rational behavior, rather than emotional overreaction, is all that this approach would require from Brown.

Returning to the majority opinion, my brothers, after recognizing a standard of reasonableness, find that was met by evidence that Zerner was worth the money. I agree—Zerner may well have been worth more money than she was being paid, *as every other faculty member at Brown may have.* Universities often pay notoriously low salaries. However, the question under the Equal Pay Act is not whether her abilities merit her pay, but rather whether her abilities merit her pay when compared to the pay other individuals re-

ceive for their level of abilities at Brown, with, in this case, the additional questions of how much it would cost Brown to replace the individual and how much Brown wants the *particular* individual, rather than merely one with similar credentials. There is little evidence on either of these last points.

Brown could violate the Equal Pay Act not only through willful and intentional actions, but also through negligent ones and ones with a benign purpose. Because the district court erred in finding a violation because of *any* consideration of sex and because it is unclear from the court's findings whether Brown acted unreasonably in responding to Zerner's offer, I would remand the case for a new trial.