**Russell S. ENDE, et al.,
Plaintiffs-Appellants,**

**v.**

**BOARD OF REGENTS OF REGENCY
UNIVERSITIES, et al.,
Defendants-Appellees.**

No. 83–2066.

United States Court of Appeals,
Seventh Circuit.

Argued May 7, 1984.

Decided March 20, 1985.

Mark D. McGuire, Crosby, Guenzel, Davis, Kessner & Kuester, Lincoln, Neb., Anthony R. Fabiano, Rockford, Ill., for plaintiffs-appellants.

Thomas Z. Hodson, Connolly, Hickey & Oliver, Rockford, Ill., for defendants-appellees.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Northern Illinois University (NIU) was confronted in late 1974 with a determination by the Regional Director of the Office of Civil Rights, Department of Health, Education, and Welfare that there was reasonable cause to believe NIU had discriminated against female faculty members with respect to promotion and salary. NIU discovered that salaries of female faculty members were in fact significantly lower than those of comparable male faculty members, and designed a formula for increasing the salaries of females to remedy that discrimination. Raises resulting from application of the formula were given to females as of September 1, 1975.

This action was brought by two male faculty members, suing on behalf of some 120 others.[1] Plaintiffs claim a violation of the Equal Pay Act, 29 U.S.C. § 206(d), because the formula was applied, and raises given accordingly, to females only. The plaintiffs sought damages equal to the difference between actual salary received and the amount each would have received since September 1, 1975 had the formula been applied to each male, plus liquidated damages.[2]

After trial on the issue of liability only, the district court entered judgment for NIU. *Ende v. Bd. of Regents of Northern Ill. University,* 565 F.Supp. 501 (N.D.Ill.1983). Plaintiffs appeal, arguing that NIU violated the Act by giving increases solely to women and denying them to men.[3]

---

1. Plaintiffs sought to maintain the action as a class action under Rule 23, F.R.Civ.P. The court denied leave because of the special provisions of 29 U.S.C. § 216(b) requiring written consent of other employees. More than 100 consents were subsequently filed on behalf of other male faculty members.

2. Because of the statute of limitations it is defendants' position if liability exists, damages are to be measured as to each plaintiff from a date two years prior to the filing of his consent.

3. The Equal Pay Act was made applicable to state and local governments by the 1974 Amendments to the Fair Labor Standards Act, 29 U.S.C. §§ 203(d) and 216(b). Defendant-appellee NIU contends that the Board of Regents is an arm of the state for Eleventh Amendment purposes. Relying on *National League of Cities*

*v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), NIU moved to dismiss the claim of plaintiffs-appellants under Rule 12(b) F.R.Civ.P. contending that the extension of the Equal Pay Act to the States is precluded and the district court lacked jurisdiction to consider plaintiffs' claims. The district court denied the motion, concluding that Congress acted constitutionally in abrogating the States' Eleventh Amendment immunity by enacting the 1974 Amendments to the Fair Labor Standards Act.

All circuit courts which have considered this question, including the Seventh Circuit, have upheld the Equal Pay Act's application to the States. *See Marshall v. City of Sheboygan,* 577 F.2d 1 (7th Cir.1978) (1974 extension of the Equal Pay Act to the States and their political subdivisions in a sex discrimination case is a valid exercise of Congress' power under the Commerce Clause); *Pearce v. Wichita Cty., City*

## I

In January, 1973, Margaret Joyce Nelson, an employee of NIU, filed a complaint with the Regional Office of Civil Rights (OCR) of the Department of Health, Education, and Welfare alleging that NIU discriminated against female faculty personnel in matters of job assignment, promotion, transfer and salary. OCR is charged with administering Executive Order 11246, as amended by Executive Order 11375, prohibiting discrimination in employment by employers who contract with the Federal Government or utilize federal funds. Under the Executive Order and the regulations issued thereunder, OCR investigates a charge of discrimination, and on the basis of this investigation issues an administrative finding. If OCR finds there is reasonable cause to believe that the charge is true, it must afford the employer an opportunity to resolve the matter through conciliation.

On December 19, 1974 OCR informed NIU that its investigation revealed that there was "reasonable cause to believe" that NIU discriminated against females because of their sex in matters of salary and promotion. At the first conciliation meeting between NIU and OCR representatives, NIU was informed that if it failed to rebut the OCR finding or enter into a conciliation agreement OCR would move to enforce its finding and terminate existing federal contracts and eliminate future federal contracts with NIU.

In late 1974 NIU conducted its own investigation. It confirmed that salaries of female faculty members were significantly lower than those of males. It is undisputed here that before the 1975 adjustment the salaries paid female faculty members resulted from discrimination against them.

The University chose to remedy the discriminatory salary practices. NIU's investigation revealed that based on a multiple regression analysis the aggregate amount of the discrepancy between annual salaries of male and female faculty members was approximately $150,000. The University therefore set out to establish a salary formula which would, in the aggregate, pay female faculty members an additional $150,000 on a yearly basis. NIU devoted an additional $150,000 of its resources to this purpose, otherwise carrying on its usual procedures with respect to salaries and increases out of its normal salary budget.

A committee was appointed to devise a method for distribution of the additional amount to the women. The formula ultimately selected by the committee was called an "affirmative action equity adjustment formula." The mean monthly salary in each rank and the mean time in rank for a male NIU faculty member were computed. Then a point system was established. Each female faculty member accumulated points based upon the amount her salary fell below the University-wide mean male salary for her rank, on the difference between her years in rank and the male mean years in rank, and on her total years of service to the University. Presumably the sex-based discrimination which was found to exist at the University may have manifested itself in women having been initially employed at lower grades than men of equal potential, promoted later, comparatively, and given less favorable merit increases from time to time. To the extent the administration made an individual determination of salary for a person coming into a particular position, such salaries may well have been lower for women. Assigning points for below average salary, above average years without promotion, and lon-

of Wichita Falls, etc., 590 F.2d 128 (5th Cir. 1979). See also Marshall v. Owensboro-Daviess County Hospital, 581 F.2d 116 (6th Cir.1978) (Amendments to Fair Labor Standards Act extending Equal Pay Act protection to employees of States and their political subdivisions is a constitutional exercise of Congress' power under section five of the Fourteenth Amendment); Usery v. Charleston County School District, 558 F.2d 1169 (4th Cir.1977); Usery v. Allegheny County Institution Dist., 544 F.2d 148 (3rd Cir. 1976), cert. denied, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). In addition, the Supreme Court has recently overruled its decision in National League of Cities v. Usery. Garcia v. San Antonio Metropolitan Transit Authority, —— U.S. ——, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Accordingly, the district court had jurisdiction.

gevity with the University would tend to compensate for factors of these types. The formula also tended to avoid excessive point awards in that negative points would be charged against a woman who received a salary above the male average for her rank or who had served fewer than the male average years in rank. Each female faculty member's point total was multiplied by sixty cents to arrive at the additional monthly amount she would receive. (Sixty cents, multiplied by the total points awarded to all females, equaled approximately the shortfall ascribed to discrimination against women.)

The adjustment was implemented with the first pay period of the 1975–76 year. NIU informed OCR of its adjustment formula. On October 30, 1975 a Regional Office Branch Chief wrote NIU noting that the University had taken action or presented acceptable commitments in several areas, including adjustment of female faculty salaries. Because of the actions taken and proposed, the Branch Chief recommended to the Washington office that the case be closed.

Between June 5, 1975 and May 12, 1977 a number of male faculty members filed complaints with the Equal Employment Opportunity Commission (EEOC) alleging that the formula adjustment discriminated against them. EEOC transferred the complaints to OCR. On November 11, 1977 the Regional Director of OCR wrote NIU that the Office had completed an investigation of these complaints and determined that there was no reasonable cause to believe that NIU had discriminated against complainants based upon sex. A detailed report was enclosed, concluding:

> The above analyses demonstrates that Northern Illinois University has voluntarily cooperated with the Office for Civil Rights to create a currently non-discriminatory salary plan situation at N.I.U. The equalization formula was developed and implemented in response to a finding of discrimination at N.I.U. The formula was a one-time remedy that sought and established equity in the N.I.U. salary structure in a reasonable manner. Accordingly, there is no reasonable cause to believe that Northern Illinois University had discriminated against male faculty members in granting female faculty members equalization raises.

On August 24, 1978 plaintiffs Ende and Marsh filed this action alleging discrimination in that women received salary increases solely because they were women and the members of the plaintiff class would have received increases if the formula had been applied to males. They sought as damages "the monthly increment each member of the plaintiff class would have received had the salary adjustment formula been applied to them" and sought an equal amount as liquidated damages.

EEOC reasserted its jurisdiction over the charges which had been filed by the males. On March 5, 1979 the District Director at Chicago issued a determination, reading in part as follows:

> The Commission concludes that the University salary adjustments and the resultant salary structure are consistent with Title VII. OCR found that female faculty members were underpaid. The formula provided a tailored, rational means of equalization. Before the salary adjustments, average female salaries were markedly below male salaries; after the adjustments, average salaries were very much on a parity.
>
> Thus, the equity increase provides a measured remedy for a clear wage violation and as such is well within the classic concepts of Title VII relief.
>
> The Charging Parties further claim that, even if female faculty salaries were properly adjusted, the salaries of those male faculty members below the average should also have been raised. The Commission does not agree. There is no evidence that male faculty members were the victims of sex discrimination. As such, they were not entitled to equity adjustments.

## II

At trial there was persuasive evidence, based on statistical analysis, that women as

a group had suffered discrimination which resulted in receiving a lower aggregate salary than received by comparable men, and that increasing the salaries paid to all women faculty members accomplished a remedy.

Professor Donna Brogan of Emory University, a highly qualified statistician, testified. She had been engaged by OCR in 1977 to examine the salary differential between men and women at NIU. After studying the data, she had answered four questions put to her by OCR.

A. *In 1974–1975, was there a salary differential between male and females?* Her conclusion was that women faculty members made significantly less money than men. As she put it, "when all of these other predictor variables are held constant, that is, you account for rank, you account for the years in rank, you account for marketplace, the variable sex still is significantly related to salary in such a way that men, just because they were men, had a higher salary . . . ."

B. *Was $150,000 a reasonable amount to distribute to women faculty members to attempt to remedy discrimination?*

She responded that it was. She described a process of developing a male "model," explaining salary based on rank, years in rank, marketplace, and so on. Then the salary of each female was predicted, based on the male model, as if she had been a man. Then the difference between the predicted salary and the actual salary paid to these women was calculated, and where the woman's salary was less than predicted, the numbers were all added up and the total was approximately $150,000.

C. *Was the manner in which the money was distributed to female faculty members a reasonable manner in which to distribute the money?*

She said she might have done it somewhat differently, but the way it was done was acceptable. She so concluded after two different statistical analyses showed that although sex was a predictor variable as to salary in 1974–75, it ceased to be so once the raises had been incorporated in the women's salaries.

D. *In the academic year 1976–77 was there any evidence of salary differential between male and female faculty members at NIU?* As already explained, analyses of the 1976–77 data showed that sex was not a significant variable.

Plaintiff did not challenge the expert testimony, nor the statistical method which Professor Brogan described. It follows from the study and analysis that there had been discrimination against women; that they had been receiving salaries which were less than those paid to men, other factors being equal; and that the payment to women of raises, computed according to the formula, corrected the results of discrimination against women and did not at the same time result in discrimination against men.

The statistical analysis, of course, deals with the composite experience of groups rather than individual cases, but it established by circumstantial evidence that NIU had previously made salary and promotion decisions as to individual women which violated Title VII, and presumably the Equal Pay Act as well.

One possible weakness of the formula for the equity adjustment was brought out at the trial, the so called marketplace factor. Faculty members of any rank command less salary in some departments than in others. For example the University does not need to pay as much to attract and retain someone in the Department of Elementary Education as in the College of Business. The formula treated female faculty members of any rank alike for all departments. Arguably the lack of any differential may have resulted in an adjustment for a woman in a lower paying department somewhat higher than needed. As a result, a women in a higher paying department may have received a lower adjustment than she should have.

Whether this was true to any significant degree was left to conjecture. Plaintiffs introduced no evidence to resolve the question. Professor Brogan testified that if she

had developed the formula she would have tried to incorporate a factor for the department a person was in, but that she did not know that it would have turned out better.

### III

The Equal Pay Act provides:

No employer having employees subject to any provisions of this section shall discriminate ... between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

The whole thrust of plaintiffs' case is that every male was entitled to have the formula applied to him and to receive a raise if the formula so indicated. They seem to contend that the formula established a "rate" of pay for female employees of the University and therefore the failure to apply the formula to men as well as women violated the Equal Pay Act. This argument misconstrues the nature of the adjustment made by the formula. The formula does not determine a rate of compensation for work done by female faculty members at NIU. Rather it determines the incremental adjustment to females' salaries necessary to remedy the effects of past sex discrimination and eliminate sex as a determiner of salary. The formula merely distributes an amount of money necessary to bring the women to a salary level they would have reached in ordinary course if

they had been men and not subjected to sex discrimination. It makes no sense to apply the formula to men in this context. Applying it to men would only serve to continue the discriminatory differential, albeit at a higher level of compensation.

Plaintiffs rely on *Board of Regents of University of Nebraska v. Dawes,* 522 F.2d 380 (8th Cir.), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976), to support their contention that granting an increase to women according to the equity adjustment formula, but withholding the increase from men violated the Equal Pay Act.

*Dawes,* however, deals with significantly different facts. The adjustment made in *Dawes* was structured very differently. The University of Nebraska created a formula for computation of salary based on values assigned to an individual's Education, Specialization, Years of Direct Experience, Years of Related Experience, and Merit. It raised the salaries of thirty-three females who were receiving less than the amount computed when the values were applied to their qualifications. Although ninety-two males were receiving less than the amount computed when the same values were applied to their qualifications, those males received no increases. As the *Dawes* Court summarized:

We simply hold that when a University establishes and effectuates a formula for determining a minimum salary schedule for one sex and bases the formula on specific criteria such as education, specialization, experience and merit, it is a violation of the Equal Pay Act to refuse to pay employees of the opposite sex the minimum required under the formula.

522 F.2d at 384.

Apparently in *Dawes* the previous existence of sex discrimination was not persuasively established, 522 F.2d at 383, n. 8. In any event the *Dawes* formula was not tailored, as in our case, to increasing the salary of females in the group in the amount necessary to correct the results of

past discrimination against members of the group.[4]

The district court in our case wrote, "The facts at trial established the plaintiffs' allegation that the plan had a disparate salary impact on male professors." 565 F.Supp. at 504. We think this means no more than that in some instances the adjustment resulted in a salary for a female in a particular job which exceeded the salary of a male in the same or closely comparable job. The only situation identified in the record, however, was that of plaintiff Russell Ende and Inez Bishop. Both were full professors in the Department of Elementary Education. On September 1, 1975 each had been a full professor for four years. Ende had been at NIU for ten years, Bishop for nine. The record does not show their comparative qualifications, teaching abilities, nor their history of promotions and merit increases. There is nothing to show specifically whether Bishop had been held back in promotion, or given fewer or lower merit increases as a result of sex discrimination, although the statistical analysis supported the proposition that that had happened generally to women.

Before the salary adjustment Bishop was receiving $1,975 per month and Ende $2,025. *Prima facie* there was wage discrimination against Bishop to the extent of $50 per month. After the adjustment, Bishop received $2,240 per month, $215 more than Ende, apparently the disparate impact referred to by the district court.[5]

It is true that an individual case may not conform to the pattern found by statistical analysis of group experience. In the present case, however, it is at least consistent with the generalizations developed by the statistical analysis that if Ms. Bishop had been a man and not the victim of discrimination she would have been receiving $2,240 as of September 1, 1975 without any adjustment. The record does not contain information about her individual employment history sufficient to verify or disprove that fact. Probably because of plaintiffs' theory that the Equal Pay Act required that every male be given the benefit of the adjustment formula, this issue was never litigated.

The district court concluded that the facts showed a "literal violation" of the Equal Pay Act, noting that "[t]he parties agree that the NIU salary structure violates the literal terms of Section 206(d)." 565 F.Supp. 501, 505. We can find no such concession by NIU in the record before us, nor in its argument on appeal. In our view the most that can be said is that viewed in isolation from the statistical proof, the Bishop-Ende example would make out a *prima facie* case. In the absence of the statistical analysis, if plaintiff Ende had sued and proved that he was paid a lower salary than a female performing the same job, he would have made out a *prima facie* case and NIU would have had the burden of establishing a defense. Here, however, in the light of the statistical proof, we think it fair to resolve the absence of further proof in favor of NIU.

The Equal Pay Act itself provides four possible defenses once a plaintiff has shown that he/she is paid less than employees of the opposite sex for equal work under similar conditions: "where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." We think that an increase which restores a victim of past discrimination to the salary level he/she would have enjoyed in the

---

**4.** The district court opinion does not examine the applicability of *Dawes* to the present facts, it merely notes that "NIU readily admits that its salary schedule would appear to be unlawful under the dictates of *Dawes.*" 565 F.Supp. at 506. We could find no such admission in the record. In its brief to this court NIU argues that *Dawes* is distinguishable on its facts. In any event we find *Dawes* inapplicable to the present facts.

**5.** It must be remembered that plaintiffs have not sought recovery by Ende of $215 per month. Rather they seek the $240 he would have gotten if the formula had been applied to him, maintaining the *prima facie* discrimination against Bishop to the extent of $25 per month.

absence of the discrimination qualifies as defense (iv) even where the discrimination itself was based on sex. To conclude otherwise would create a wholly unnecessary tension between compliance with the anti-discrimination provisions of Title VII (and of the Equal Pay Act itself) with the Equal Pay Act.

 Although the Equal Pay Act is narrowly focused on the problem of wage differentials based on sex its broad remedial purpose is the elimination of sexual discrimination against women. *Shultz v. American Can Company-Dixie Products*, 424 F.2d 356, 360 (8th Cir.1970).

> The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.

*Shultz v. Wheaton Glass Co.*, 421 F.2d 259 (3rd Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). In addition, the Equal Pay Act should be read *in pari materia* with the provisions of Title VII regarding discrimination in compensation based on sex, and neither should be interpreted in a manner that would undermine the other. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 446 (D.C.Cir.), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

 Because we conclude that plaintiffs failed to prove a violation of the Equal Pay Act, we affirm the judgment.

## IV

The district court followed different reasoning. Concluding that "literal violation" had been shown, the court considered the adjustment formula an affirmative action program which was a reasonable effort to eliminate discrimination against a frequently victimized class. The court decided that

---

**6.** The court differed from *Lyon v. Temple Univ. of Com. System of Higher Educ.*, 543 F.Supp.

---

the program was authorized under the principles of *United Steelworkers of America, AFL–CIO–CLC v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).[6]

Because of our view that no violation has been established, we do not reach the question whether the *Weber* principles could be relied on. Construction of the statute so as to relieve tension between correction of the results of past violations of Title VII and the Equal Pay Act is at least consistent with the principles of *Weber*. Here a statistical study of composite group experience has demonstrated that the salaries paid to women were lower than those paid to comparable men, and that the adjustment formula eliminates the differential resulting from past discrimination. The formula has been thrice blessed by administrative approval, and found to have been devised in good faith. It is possible, though not established here, that a formula tested by a statistical study of the group could produce an increase for one or more females greater than necessary to place her at the salary level she individually would have reached in the absence of discrimination. If such "misfiring" of the formula were established in individual instances and resulted in greater compensation for those females than is paid to comparable males performing the same work, then the question would arise whether *Weber* principles nonetheless would save the adjustments. As pointed out in the district court, the test, if applicable, would be whether the plan does "unnecessarily trammel the interests of" male employees. 565 F.Supp. at 507.

The judgment appealed from is AFFIRMED.

---

1372 (E.D.Pa.1982).