**Ted J. SMITH, III, et al., Plaintiffs,**

v.

**VIRGINIA COMMONWEALTH UNIVERSITY, Defendant.**

**Civ. A. No. 3:93CV297.**

United States District Court,
E.D. Virginia,
Richmond Division.

July 8, 1994.

Bradley Brent Cavedo, Shuford, Rubin & Gibney, Richmond, VA, for plaintiffs.

Neil Anthony McPhie, Guy Winston Horsley, Jr., David Lee Ross, Office of Atty. Gen., Richmond, VA, for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on plaintiffs' motion for partial summary judgment and defendant's motions for summary judgment. For the reasons stated below, the Court denies the plaintiffs' motion and grants the defendant's motion on the merits.

### I. Facts

In the spring of 1988, in response to recommendations from several groups within Virginia Commonwealth University ("VCU"), including the Subcommittee on the Concerns of Women of the AA/504 Committee,[1] the Provost and Vice President for Academic Affairs appointed a Salary Equity Study Steering Committee and charged its members with investigating gender disparity in faculty salaries. The committee was composed of five men and three women.

The committee limited the scope of the salary equity study to an examination of the salaries of tenured or tenure-eligible instructional faculty at the rank of assistant professor or higher. Clinical faculty, such as faculty in the School of Medicine, the Department of Oral Surgery in the School of Dentistry and the Department of Human Genetics in the School of Basic Health Sciences, were excluded because their compensation is determined by a system that does not apply to other instructional faculty. In making its study, the committee selected a statistical model known as multiple regression analysis and used in connection with this analysis such data elements as faculty educational level, tenure status, number of years of VCU experience and number of years of prior academic experience.[2] When the study was completed in August 1989, the committee reported that, controlling for permissible factors such as academic rank and experience, the regression analysis demonstrated that female faculty members at VCU, on the average, earned $1,354 less than their male counterparts. See Salary Equity Study at 10.[3]

Following a review of the study results by VCU's administration, a decision was made to include approximately $335,000 in VCU's budget for fiscal year 1991–1992 to implement the study's findings by increasing the compensation of female faculty members who subsequently were determined to warrant a salary adjustment.[4] In April 1990, the Board of Visitors approved this funding for the 1991–1992 fiscal year, and the budget item was reaffirmed by the board in April 1991.[5]

Also during the spring of 1991, the university Provost established the Salary Equity Study Implementation Committee, which was charged with implementing the study's findings. This committee chose a "case review" as opposed to an "across-the-board" approach to implementation and, during the fall of 1991, considered the curriculum vitae of

1. The AA/504 (which stands for affirmative action/section 504 of the federal Rehabilitation Act) Committee reviews and makes recommendations regarding VCU's equal opportunity and nondiscrimination programs and efforts.

2. Similar studies using multiple regression analysis have been used at other universities such as the Universities of Connecticut, Maryland, Wisconsin–Milwaukee and Virginia and Virginia Polytechnic Institute and State University. See Salary Equity Study at 4.

3. In the summer of 1991, the statistical model was rerun using the then-current pool of tenured and tenure-eligible faculty, and the average disparity increased to more than $1,900. See Def.'s Ex. 5.

4. The budget figure was calculated by (1) multiplying the number of female faculty members included in the study pool by the amount it had been determined that female faculty members, on the average, were being "underpaid" (187 × $1,354) and (2) adding fringe benefit costs to this product.

5. Because the total amount originally budgeted by the Board of Visitors for salary equity increases ultimately was recommended for distribution directly to female faculty members, an additional sum of approximately $100,000 was approved by the Board in 1992 to cover fringe benefits. Thus, the total cost for adjusting salaries for female faculty members was $441,791.

each female faculty member who fell within the category of faculty members whose salaries were examined in the salary equity study and who requested salary review. The committee recommended percentage increases ranging from 1 percent to 40 percent, with the median increase being 3.3 percent or $1,414, for the female faculty members who had requested consideration.[6] The total dollar amount of recommended increases was approximately $320,000. In December 1991, the Implementation Committee's recommendations were submitted to the Provost who, in turn, submitted them to the President and the VCU Board of Visitors.

The Board of Visitors approved the salary increases on January 16, 1992, and the adjustments were first paid on March 16, 1992, retroactive to July 1, 1991.

The five male named plaintiffs have filed suit against VCU on behalf of themselves and other similarly situated male faculty members.[7] The plaintiffs allege a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Specifically, the plaintiffs contend that because VCU adjusted the salaries of female faculty members in 1992, male faculty members were discriminated against on the basis of their sex.

## II. *Analysis*

### A. STANDING

■ In its motion for summary judgment, VCU contends that each of the named plaintiffs lacks injury in fact and thus lacks standing to pursue his claim of employment discrimination. Regardless of the merits, a lack of standing will bar plaintiffs' claims. Accordingly, the Court addresses this issue first.

VCU contends that the ultimate issue of discrimination before the Court is whether its action in awarding salary increases to certain female faculty members created instances of individual pay disparity on the basis of gender. Thus, VCU alleges, plaintiffs must be able to demonstrate that they have experienced discrimination in pay on the basis of gender. Since plaintiffs have acknowledged that they have no female comparators with respect to their individual salary circumstances, VCU claims that they cannot demonstrate discriminatory injury in this suit.

Title VII prohibits, *inter alia,* employers from discriminating against an individual with respect to his compensation because of his sex. 42 U.S.C. § 2000e–2(a)(1). Thus, if, as alleged, VCU discriminates on the basis of sex in paying compensation, plaintiffs are being treated in a manner prohibited by Title VII. Furthermore, unequal treatment based on an impermissible reason is an "injury in fact" under Article III of the Constitution. *See Heckler v. Mathews,* 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984) (conferring standing on plaintiff who alleged that statutory provision subjected him to unequal treatment in the provision of his Social Security benefits solely because of his gender; specifically, as a nondependent man, he received fewer benefits than he would if he were a similarly situated woman); *Cunico v. Pueblo Sch. Dist. No. 60,* 917 F.2d 431, 441 (10th Cir.1990) ("When a claim is made for a violation of equal protection resulting from discriminatory conduct, 'the right invoked is that to equal treatment,' .... Standing in such a case exists for 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct."). Finally, the Supreme Court recently stated:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. City of Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993). Accordingly,

---

6. Of the 205 female faculty members eligible for salary review, 172 requested it.

7. The Court provisionally denied plaintiffs' motion for class certification on April 19, 1994.

plaintiffs in this case contend that VCU distributed a benefit ($441,791 in salary and benefits) and erected a barrier in the form of the gender-based implementation of the Salary Equity Study, thereby making it impossible for plaintiffs to obtain any part of the benefit. The Court concludes that this allegation of unequal and discriminatory treatment is sufficient to confer standing on plaintiffs.

## B. SUMMARY JUDGMENT UNDER RULE 56

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are material if they might affect the outcome of the case; there is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### 1. *Johnson v. Transportation Agency*

■ Both sides agree that VCU's pay raise constituted affirmative action in favor of VCU's female faculty, who had allegedly suffered discrimination in the past. As previously noted, Title VII prohibits discrimination against individuals with respect to compensation because of the individual's sex. *See* 42 U.S.C. § 2000e–2(a)(1). Therefore, a literal interpretation of the statute would preclude all gender-conscious affirmative action as discriminatory against men. Public employers such as VCU, however, may institute voluntary gender-based affirmative action programs when there is a manifest imbalance in traditionally segregated job categories. *Johnson v. Transportation Agency*, 480 U.S. 616, 628, 631, 107 S.Ct. 1442, 1450, 1451, 94 L.Ed.2d 615 (1986) (quoting *United Steelworkers v. Weber*, 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979)).[8] Where such imbalance is shown to exist, however, the program must not unnecessarily trammel the rights of male employees or

create an absolute bar to their advancement. *Id.* at 637–38, 107 .S.Ct. at 1455 (quoting *Weber*, 443 U.S. at 208, 99 S.Ct. at 2729–30).

In *Johnson*, the Supreme Court addressed the legitimacy of voluntary affirmative action for women under Title VII.[9] The case involved an affirmative action plan that provided that the Transportation Agency could consider as one factor the sex of a qualified applicant when making promotions to positions within traditionally segregated job classifications in which women had been significantly underrepresented. 480 U.S. at 620–21, 107 S.Ct. at 1446. The Agency implemented its plan in response to findings that women composed only 22.4 percent of Agency employees although they constituted 36.4 percent of the area labor market and that women employees at the Agency were concentrated in job categories traditionally held by women. *Id.* at 621, 107 S.Ct. at 1446. The Agency stated that its short-term objective was to achieve a statistically measurable yearly improvement in hiring, training and promotion of women in all major job classifications where they were underrepresented. *Id.* The Agency's long-term goal was to attain a work force whose composition reflected the proportion of women in the area labor force. *Id.* A male employee who, pursuant to the plan, had been passed over for a promotion in favor of a female employee, brought suit alleging that he had been denied promotion on the basis of sex in violation of Title VII.

The Court first concluded that the plan was designed to eliminate Agency work force imbalances in traditionally segregated job categories, which justified taking sex into account. 480 U.S. at 637, 107 S.Ct. at 1454–55. In coming to this conclusion, the Court stated that, in determining whether a manifest imbalance existed, a court should compare the percentage of women in the employer's work force with the percentage in the relevant labor market. *Id.* at 631–32, 107 S.Ct. at 1451–53. Where the job required

---

8. Though plaintiffs deny that a manifest imbalance exists in this case, they presume the existence of such an imbalance for purposes of their summary judgment motion.

9. The Court had earlier addressed the legitimacy of such plans for minorities in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

special training, the relevant market would be those in the labor force who possess the necessary qualifications. *Id.* at 632, 107 S.Ct. at 1452. The imbalance need not rise to the level of prima facie evidence of intentional past discrimination by the employer, however, "since [the Court] do[es] not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans." *Id.*[10]

The Court next found that the rights of male employees were adequately protected because: (1) the plan allowed gender to be considered as one of a number of factors in making employment classification and did not exclude male employees from consideration; (2) petitioner had no absolute entitlement to the promotion as there were several qualified applicants; thus, petitioner had no legitimate firmly rooted expectation in the promotion; (3) petitioner retained his employment at the same salary and seniority and remained eligible for other promotions; and (4) the plan was designed to attain, and not maintain, a balanced work force and was reasonably related to its remedial purpose. 480 U.S. at 637–40, 107 S.Ct. at 1454–56; *see also Weber*, 443 U.S. at 208, 99 S.Ct. at 2729–30. Plaintiffs contend that VCU's plan meets none of these requirements and therefore violates the rights of male faculty.

### 2. *Application of Johnson*

■ Plaintiffs would have the Court apply *Johnson* and *Weber* literally, with no acknowledgement of the factual differences between those cases and the present case. These differences, however, make all the difference. The Supreme Court developed its affirmative action in employment analysis in the context of cases involving hiring, promotions,[11] access to training programs,[12] etc. Accordingly, the Court fashioned standards to indicate when an employer would be justified in choosing a less qualified individual over another applicant because of the former applicant's status as a racial or ethnic minority or as a woman or in choosing between two equally qualified applicants on the basis of race, sex or ethnicity. Hence, for example, the Court required that the manifest imbalance be in traditionally segregated job categories so that some evidence of historical discrimination, either by the employer or by society at large, would be provided.[13] In addition, the requirement that gender not be the sole criterion in making employment classification so that male employees are entirely excluded from consideration prevents the imposition of rigid quotas that bear no connection to the goal of remedying inequality of opportunity.

Unlike the factual scenario contemplated by the Supreme Court in its affirmative action cases, the present case involves a statistically demonstrated disparity between the salaries of men and women professors at VCU. The statistical analysis showed an average difference of $1,354 in salaries between male and female faculty members that could not be explained by permissible factors in the statistical model.[14] *See* Salary Equity

---

10. In reaching this conclusion, the Court rejected Justice O'Connor's view that "the proper initial inquiry in evaluating the legality of an affirmative action plan by a public employer under Title VII is no different from that required by the Equal Protection Clause. In either case, consistent with the congressional intent to provide some measure of protection to the interests of the employer's nonminority employees, the employer must have had a firm basis for believing that remedial action was required. An employer would have such a firm basis if it can point to a statistical disparity sufficient to support a prima facie claim under Title VII by the employee beneficiaries of the affirmative action plan of a pattern or practice claim of discrimination." 480 U.S. 616, 649, 107 S.Ct. 1442, 1461 (O'Connor, J., concurring in judgment).

11. *See Johnson*, 480 U.S. 616, 107 S.Ct. 1442.

12. *See Weber*, 443 U.S. 193, 99 S.Ct. 2721.

13. "The requirement that the 'manifest imbalance' relate to a 'traditionally segregated job category' provides assurance both that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination, and that the interests of those employees not benefiting from the plan will not be unduly infringed." *Johnson*, 480 U.S. at 632, 107 S.Ct. at 1452.

The Court stated, however, that an employer need not show its own prior discrimination in order to institute voluntary affirmative action. *Id.*

14. The model used the following independent variables: educational level (doctorate or no doctorate), tenure status, gender, whether an indi-

Study. In response, VCU gave salary increases to female faculty who had been included in the salary equity study and who requested review for a salary adjustment. In such a situation, where access to an employment position is not at issue, the number of female professors at VCU as compared to male professors is irrelevant. Instead, the relevant manifest imbalance would be in compensation rather than in traditionally segregated job categories, and the results of the study revealed such an imbalance.[15] Though VCU admitted to no past discrimination against women, such an admission is not necessary. *See Johnson,* 480 U.S. at 632, 107 S.Ct. at 1452–53.

Accordingly, the Court must next determine whether VCU's award of salary increases to certain female faculty members unnecessarily trammeled the rights of male employees. The Court finds that VCU's action did not. When faced with a gap in salaries

based on gender, VCU remedied it directly by awarding pay increases to the victims of the discrimination. In doing so, VCU did not reduce the salary of any male member of its faculty. In fact, the salary increases were awarded outside the normal salary administration process; thus, the salaries of male faculty were in no way affected. Male faculty members were not harmed in any way. Their chances for future salary increases, promotions, etc. were unchanged. It is hard to imagine a remedy more narrowly tailored to achieve the goal of equality in compensation. Because the study revealed a systematic discrepancy in salaries between males and females as a group, VCU sought to resolve the problem systematically. *See* Salary Equity Study at 17.

Plaintiffs contend that VCU's plan unnecessarily trammeled their rights because it (1) made gender the only factor to be considered in awarding salary increases; (2) was de-

---

vidual had received "quick tenure," *i.e.,* received tenure within four years of appointment at VCU, whether the individual was a department chairman, number of years experience at VCU, number of years of prior academic experience, and national salary average. The dependent variable was, of course, salary.

15. Plaintiffs dispute the validity of the study because it failed to include performance factors as variables. The study concluded that performance variables such as research productivity and quality, teaching quality and load, publication quantity and community service, generally are not available and/or not suitable for statistical analysis since coding of these variables is very subjective or qualitative compared to the relatively straightforward coding of other factors such as rank or tenure status. Salary Equity Study at 3. Given the difficulties involved with coding for such variables, most salary equity studies have reserved the review of performance factors for the remedy mechanism established as a result of the study, as did VCU. *See id.* at 4.

The addition of performance measures to the regression analysis would not affect the average salary difference the study found between males and females unless substantial differences relating to salary exist in the average career performance between men and women. In rejecting the inclusion of performance measures, the study concluded that "[a]lthough there are individual differences in faculty performance, the steering committee believes that there is no reason to suspect that female faculty members are less productive *on the average* than male faculty members." Salary Equity Study at 17. In addition, those conducting the study recognized that

the analysis should be used for evaluating differences among classes of faculty and that "[b]ecause of other variables that can affect *individual* salaries (primarily performance-related factors), it is not appropriate to use the model to assess the equity of a specific faculty member's salary. Other methods should be developed to conduct the individual evaluations." Def.'s Ex. 5 (Memo. from Mark D. Willis to Charles P. Ruch re update of Salary Equity Study). In fact, the study conducted at the University of Maryland concluded there was *relatively little improvement in* the estimates of the coefficients when simple performance variables were added to a regression model. *Id.* Significantly, plaintiffs' expert, Dr. Fred S. McChesney, acknowledged that he had never performed a pay study himself and that he knew of no study that had included the productivity or performance variables he believed to be required for a valid study. *Id.* at 47.

Furthermore, no record evidence exists that including these additional variables would have altered the results of VCU's study. Dr. McChesney admitted that he did not object to the variables VCU had included and that even if performance variables were included, it would be possible that the study results would be essentially the same. *See* McChesney Dep. at 61–62. On the other hand, VCU's expert, Dr. Rebecca J. Klemm, stated that "the pattern was the same regardless of whatever model [she] ran," *i.e.,* that there was always a gender difference when she tested female and male salaries at VCU using various models. *See* Klemm Dep. at 135–36; *see also* Def.'s Ex. 6 (Memo. of Lloyd Byrd, Jr. stating there was no change in statistical result after preparing other models at faculty request).

signed to maintain a balanced work force and was not related to a remedial purpose; and (3) contained no assurance that it was temporary. These contentions, however, are inaccurate. First, though only women were eligible to receive raises, to claim that gender was the sole criterion in awarding the increases would require ignoring the salary equity study, which revealed that women were being paid less than men even when permissible reasons were taken into account, and the nature of the remedy, which was narrowly tailored to alleviate the discrimination against these women.[16]

Second, plaintiffs' insistence on the requirement that the plan attain a balanced work force rather than maintain it results from a misunderstanding of this requirement. This standard reflects the Court's understanding that a work force may contain disproportionate numbers of members of a certain race, ethnicity or gender though no discrimination has occurred. Accordingly, once balance has been attained, or, in other words, minorities and women have been placed on a level playing field, then the affirmative action plan is no longer necessary. Mere balance is not the goal, but rather the goal is equality of opportunity. Obviously, then, this principle has a different meaning when applied in the context of compensation. A level playing field, in this context, requires that people receive equal compensation for equal work.[17] Unequal compensation, where the basis for it rests solely on gender, is never appropriate. In addition, plaintiffs contend that the fact that females who were earning more than predicted based on the Salary Equity Study received salary increases is evidence that the increase failed to

relate to a permissible goal. But as the study pointed out, "Because of the unique circumstances that affect individual salary levels, the [statistical] model is not as useful for identifying specific individuals who have salary equity problems. The systematic differences require a systematic solution." Salary Equity Study at 18.

Finally, the raises given to some female professors constitute a one time salary adjustment to remedy unequal compensation based on gender. In this sense, the remedy is temporary. The effects, however, are permanent. But this is the goal of affirmative action—to remedy past discrimination and to promote equality of opportunity. In the normal Title VII case involving access to an employment position, equality of opportunity is created by creating a level playing field and then discontinuing the hiring or promotion preferences. Cases involving unequal compensation are obviously different.

Indeed, this case may be more appropriately compared to a case brought under the Equal Pay Act.[18] *Ende v. Board of Regents of Regency Univ.*, 757 F.2d 176 (7th Cir. 1985), an Equal Pay Act case that was post-*Weber* but pre-*Johnson*, sheds some light on this case. In *Ende*, the university used a multiple regression analysis to determine the aggregate amount of the discrepancy between annual salaries of male and female faculty. The court upheld the university's award of salary increases to female faculty. In rejecting the plaintiffs' argument that the same formula used to increase female faculty salaries should have been applied to increase the salaries of male faculty, the court stated:

---

**16.** Plaintiffs argue that VCU contravened the "crucial principle" that "[t]he purpose of affirmative action is not to make identified victims whole, but rather to dismantle prior patterns of employment discrimination to prevent discrimination in the future," *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 474, 106 S.Ct. 3019, 3049, 92 L.Ed.2d 344 (1986). Generally, affirmative action remedies cannot directly compensate actual victims because these victims cannot be identified. In this case, however, VCU managed, through its remedy, to both compensate actual victims and dismantle a discriminatory compensation scheme. No principle exists that prevents such an accomplishment.

**17.** Equal compensation is also required by the Equal Pay Act, which prohibits an employer from discriminating on the basis of sex "by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions...." 29 U.S.C. § 206(d)(1).

**18.** Though the plaintiffs originally brought an Equal Pay Act claim, the Court dismissed it because the plaintiffs lacked comparators.

The formula [for the equity adjustment] does not determine a rate of compensation for work done by female faculty members at NIU. Rather it determines the incremental adjustment to females' salaries necessary to remedy the effects of past sex discrimination and eliminate sex as a determiner of salary. The formula merely distributes an amount of money necessary to bring the women to a salary level they would have reached in ordinary course if they had been men and not subjected to sex discrimination. It makes no sense to apply the formula to men in this context. Applying it to men would only serve to continue the discriminatory differential, albeit at a higher level of compensation.

757 F.2d at 181. The court speculated that in specific instances the formula might be shown to produce an increase for a female that was greater than necessary to place her at the salary level she individually would have reached in the absence of discrimination and to result in greater compensation for this female than was paid to a comparable male performing the same work. But, the court stated, the question then would arise whether *Weber* principles could save the adjustments in that the court would have to determine whether the plan unnecessarily trammeled the interests of male employees. 757 F.2d at 183.

### III. *Conclusion*

For the foregoing reasons, defendant's motion for summary judgment on the merits is granted.

Let the Clerk send a copy of this Memorandum Opinion and the accompanying Final Order to all counsel of record.